## Staunton.

### J. J. OLIVER V. COMMONWEALTH.

September 22, 1921.

INTOXICATING LIQUORS—*New Trial—Evidence Insufficient to Support Conviction—Case at Bar.*—A prohibition officer was convicted of violating the prohibition law by having unlawful possession of, transporting, exposing for sale, and soliciting orders for ardent spirits. The liquor alleged to have been offered for sale had been seized by the officer in pursuance of his duty. In the testimony for the Commonwealth it did not appear that the prohibition officer offered to sell any of the liquor to any person, or authorized any other person to make such sale. While the evidence on behalf of the Commonwealth might be consistent with the guilt of the accused, it was very far from being inconsistent with his innocence.

> *Held:* That, upon the whole case, the evidence was not sufficient to support the finding of the jury.

Error to a judgment of the Hustings Court of the city of Richmond.

*Reversed.*

The opinion states the case.

*Mapp & Mapp* and *L. O. Wendenburg,* for the plaintiff in error.

*John R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General,* and *Leon M. Bazile, Second Assistant Attorney-General,* for the Commonwealth.

BURKS, J., delivered the opinion of the court.

Oliver, the plaintiff in error, was convicted of violating the prohibition law (Acts 1918-C 388) by having unlawful possession of, transporting, exposing for sale, and soliciting orders for ardent spirits, and sentenced to be confined in jail for thirty days and to pay a fine of $250.

There are a number of assignments of error, among them that the trial court erred in refusing to set aside the verdict for lack of evidence to support it. We are of opinion that this assignment of error is well taken. It will be unnecessary, therefore, to consider the other assignments.

Oliver and S. L. Chase were prohibition inspectors, and, amongst other things, were charged with the duty of destroying stills and apprehending persons engaged in violation of the prohibition law. On Saturday, October 18, 1919, after a successful week's work in counties near Richmond, they discovered a still in Amelia county on a tract of land of which Charles W. Venable was the tenant. Two men were found at the still, but they made their escape. Oliver and Chase, however, took possession of one five-gallon keg and three one-gallon jugs or bottles of whiskey, and of the still, loaded them into the Ford machine in which they were traveling, and carried them to the city of Richmond, to the office of the Prohibition Commissioner. Before leaving the farm they endeavored to find Venable, but he and his family were absent from home. A colored man, however, was there, who had been plowing for Venable that day, and Oliver left a note and also a verbal message for Venable saying that they had found a still and a five-gallon keg of whiskey and three one-gallon jugs of whiskey, and advising him to go to the courthouse in Amelia county and surrender himself to the attorney for the Commonwealth, or to come to the Prohibition Commissioner in the city of Richmond. This note appears to have been signed by Oliver in his own name and

also that of Chase.  Venable could not read, but had the note read to him by his wife, and testified that the verbal message was also delivered to him, describing, as afore-stated, what they had captured, *i. e.*, the still and the kegs and jugs of whiskey aforesaid.  They started for Richmond late in the evening and arrived at the office of the Prohibition Commissioner about 10:30 P. M.  They unloaded the still and put it in the office of the Prohibition Commissioner, and also a bag of apples which they had purchased.  Just at this time and before the whiskey had been unloaded, "Nubby Arnold" appeared on the scene and stated to them that he knew where three or four cases of bottled-in-bond whiskey was, just brought in that day, and that he could take them to it.  Arnold had shortly before that (about two or three weeks) given them information as to the location of a lot of bottled-in-bond whiskey, and as a result of this information they had taken forty-one quarts of whiskey and captured the man who had it in charge.  There was no place at the prohibition office where the whiskey could be left with safety and, after a brief conference between Oliver and Chase, they determined to take Arnold with them in the machine along with the whiskey, and go after that which Arnold had spoken to them about.  Arnold got in the car with them and directed the route to be taken until they were far out on the outskirts of the city, when he asked them to stop and wait a minute, and with that he got out of the car and went diagonally across the street to the house which turned out to be that of a colored man, William Stewart, whose house had been several times searched for whiskey.  Down to this point there is absolutely no controversy about the facts. What thereafter transpired is in many respects in great doubt and uncertainty.  The chief witness for the Commonwealth was Policeman Chinault, of the city of Richmond, who was not only flatly contradicted by other witnesses on the most material points of his testimony, but also,

time and again, made statements on trial in conflict with his testimony before the police court on the preliminary examination of the case, which testimony had been taken down by a stenographer, and was admitted by the attorney for the Commonwealth to be correct. Notwithstanding these contradictions, it was the province of the jury to hear and consider all of the testimony, and settle the disputed questions of fact. According to the testimony of Chinault, which seemed to have been accepted by the jury, he and Policeman Porter were in that section of the city and heard the engine of an automobile running, and rode up to where it was, and found Oliver sitting at the wheel, and inquired of him why his rear light was not burning. Oliver made some excuse for his delinquency and got out of his machine to light his rear light. In doing so, he exposed a pistol in his hip pocket, which Policeman Porter reached down and pulled out, and asked what he was doing with it, and he replied that they were prohibition officers, and exhibited his badge. The pistol was then given back to him. The automobile had no side curtains and the keg and three jugs were sitting in the space between the two seats open to observation. Chinault asked Oliver what was in the car, and Oliver replied there was not anything in the car. At that time, however, Chinault had seen what was in the car. About that time Chinault saw William Stewart walking along the street not far from the automobile and stopped him and asked him what was coming off, and Stewart replied "not anything." Chinault said to him then, "Come clean, don't give me that stuff," and Stewart replied, "Well, the man Arnold that just went up the hill is the man that was at my house and tried to sell me some whiskey at $20.00 a gallon and I refused to buy it, and he dropped to $17.00 a gallon." Just before this Arnold had come out to the machine where Chase and Oliver were, and Chinault had inquired of Oliver if Arnold was with him and Oliver replied "No." And

Arnold was told to go on, which he did. Arnold also, in reply to a question from Chinault, had stated that he was not with them. After Arnold left, Chinault put the defendant under arrest, and walked over to where the car was and Oliver told him that there were eight gallons of whiskey in the car, and also gave him an account of the capture of the whiskey that day. There is much other testimony relating to what took place at the time of the arrest and subsequently, but it is not deemed necessary to set it out here. William Stewart was also examined as a witness for the Commonwealth, and states that Arnold came to his house and offered to sell him eight gallons of whiskey, but nowhere in the testimony for the Commonwealth does it appear that Oliver or Chase ever offered to sell any of the whiskey to any person, or authorized any other person to make such sale. Arnold undoubtedly did go with them, and if the evidence of the Commonwealth is to be accepted as true that they denied that fact, then they simply lied as to that question. But this is far from establishing the fact that Oliver offered whiskey for sale, or authorized Arnold to offer it for sale. They were dealing with a suspected party and used their own devices to entrap him, and if Arnold lied in this conversation, that is no ground for convicting Oliver of offering the whiskey for sale.

Evidence was also introduced by the Commonwealth to show that in September, 1919, the accused offered to sell F. D. Kelly, one or two cases of whiskey in pint bottles, and that in the latter part of September he offered to sell George W. Smith some whiskey known as "Four Roses."

It should be said in respect to the offers to sell to Kelly and Smith that it appeared in the evidence that on neither occasion did Oliver have any whiskey with him to sell, and that the offer was merely an effort to entrap these parties.

Oliver and Chase had the undoubted right to take the whiskey along with them for safe-keeping while they were

in search for the additional whiskey which Arnold said he could find, and it seems incredible that they should attempt to sell that whiskey after having left both verbal and written evidence of what they had captured on the afternoon of that day.

The Attorney-General, after making a statement of the evidence offered on behalf of Oliver, concludes this branch of his argument as follows: "This is a fair summary of the evidence in this case. We are frank to say that the fact that before coming to Richmond, the accused left written evidence of his possession of the whiskey, and the fact that the Prohibition Commissioner investigated the matter after the arrest of the accused, yet kept the inspectors in his employ, all of which is undisputed, raises some question as to whether there was sufficient evidence to support the verdict that the accused was offering for sale ardent spirits. However, the jury passed upon this, and we do not feel that we can say that the verdict was without evidence to support it."

It seems fairly plain that the only reason that the Attorney-General did not confess error was because the jury had found the prisoner guilty on the evidence and he did not think that under these circumstances he should confess error founded entirely on the testimony.

The evidence on behalf of the Commonwealth may be consistent with the guilt of the accused, but it is very far from being inconsistent with his innocence.

Upon the whole case, we are of opinion that the evidence was not sufficient to support the finding of the jury, and for this reason the verdict of the jury and the judgment of the hustings court will be set aside, and the case remanded to that court for a new trial, if the attorney for the Commonwealth shall be of opinion that he can make a better case on another trial than at the former hearing.

*Reversed.*